McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 - Telephone
(212) 609-6921 -  Facsimile
David J. Adler (DA-0048)
dadler@mccarter.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| | : | Chapter 11 |
| In re: | : | Case Nos. 06-12226 (RDD) |
| | : | |
| COUDERT BROTHERS LLP, | : | |
| | : | |
| Debtor. | : | |
| | : | |

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SEEKING AN ORDER APPOINTING A CHAPTER 11 TRUSTEE

TO:     THE HONORABLE ROBERT D. DRAIN,
          UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors of Coudert Brothers LLP ("Coudert", or

the "Debtor"), by and through its counsel, hereby files this motion seeking an order pursuant to

sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, appointing a chapter 11 trustee (the

"Motion").  In support of the Motion, the Committee respectfully represents as follows:

#### Preliminary Statement

After a substantial number of partner defections in the last few years and a consequent

decline in revenue and profitability, Coudert began experiencing financial difficulties.  By

December 31, 2004, Coudert was in default of its financing agreements with JPMorgan Chase

and Citibank (collectively, the "Banks"), exposing partners to personal liability for loans totaling

more than $23 million.  Failed merger discussions with other law firms, Orrick Herrington & Sutcliffe and Baker & McKenzie, sealed the fate of this 150-year-old institution.  Indeed, no later than May 2005, Coudert had formulated a written wind down plan, a close examination of which made plain that a deficiency of more than $26.0 million was certain to occur.  Before commencing the inevitable wind down, however, and despite undeniable evidence that creditors would not be paid in full from existing assets, Coudert engaged in deliberate pre-bankruptcy financial engineering in an effort to ensure that Coudert's partners (its equity holders) would be protected from personal liability.  As a result, Coudert made a certainty that creditors, <u>other</u> <u>than the</u> <u>Banks</u>, would not be paid in full.  Specifically, in the summer of 2005, the firm pledged all of its assets to its Banks and, thereafter, devoted substantially all of its financial resources to repayment of Bank debt—callously disregarding its obligations to other creditors and the need to reserve sufficient liquidity with which to complete the wind down strategy that was finally adopted in August, 2005.  Then, in its most obvious effort to minimize partner exposure to creditor claims, the newly created "Special Situations Committee" waited more than one year before filing a petition for bankruptcy relief, in anticipation of avoidance of claims against the partner "insiders".

To make matters worse, during the course of its wind down, Coudert failed to restrain itself and its partners as assets were sold under the supervision of self-interested partners or looted by those with less control.  After giving its New York office to Baker & McKenzie (at which time each member of the Special Situations Committee became a partner thereof), Coudert was a rudderless ship casting about without direction in open waters.  Fixated on the elimination of bank debt for which its partners were personally liable, Coudert ignored its other creditors,

landlords and even its employees, leaving behind an under-funded pension plan and virtually no cash with which to responsibly conclude the firm's remaining affairs.

By the end of 2005, Coudert was faced with substantial and mounting litigation, in law-suits filed across the country by creditors, landlords and former clients. The firm was self-insured for up to $5.0 million in each of its malpractice policy years, as a result of which, Coudert could be required to spend millions of dollars if it chose to defend itself even against claims which should have been settled. Despite the immediate relief from continued litigation that could have been obtained in bankruptcy, a decision was made to use the firm's dwindling cash resources to defend against claims by creditors and former clients. This transparently self-interested decision typified the decision-making process at Coudert after June 1, 2005.

In anticipation of bankruptcy and in recognition of the need for at least the appearance of responsible management and decision making, on July 31, 2006, the defunct Special Situations Committee (the "SSC") was resurrected and reconstituted to include: (i) the last remaining lawyer on staff at Coudert; (ii) the firm's long time executive director; and (iii) an outside attorney. Even though most of Coudert's remaining employees were given 20% raises less than one year earlier, on September 13, 2006, each remaining member of Coudert's bloated "wind down" team (including each member of the SSC) was given an employment agreement affording them substantial severance and other benefits (including continuation of a 401k match). Incredibly, and despite the inability of Coudert to pay even the most basic expenses, certain employees also received extraordinary cash payments in September 2006, totaling approximately $185,000.

Once a year had passed, and Coudert believed that the "coast was clear" to file for bankruptcy protection, the firm couldn't even muster up the resources necessary to retain lawyers

and accountants who would be needed to provide essential services. In order to retain counsel, Coudert pledged and physically delivered its art collection to its bankruptcy counsel, while the rights to certain accounts receivable were pledged to the many special litigation counsel it had retained.

Because of the utterly reckless way in which its wind down has been and continues to be handled, the Debtor's present financial condition is acute. To date, postpetition rent and other expenses have gone unpaid because the firm has no cash with which to satisfy these obligations. Refusing to be constrained by reality, Coudert continues to profess its solvency and it continues to employ an ethically compromised wind down team that drains the bankruptcy estate of approximately $200,000 each month in salary and benefits. Patricia Kane, the former Executive Director of the Debtor, is presently paid $500,000 per year to oversee a wind down which entails little more than the collection of outstanding accounts receivable, the disposition of client records and the pursuit of claims against former partners and third parties.[1] The Committee has repeatedly requested that the Debtor discharge its fiduciary duty to creditors by immediately reducing its headcount and expenses. As recently as December 5, 2006, the Debtor has refused to make even the most obvious changes, choosing instead to use the Committee's cries for change as an opportunity to negotiate a comfortable transition for the senior-most members of the wind down team.

Viewed in the most charitable light, Coudert has recklessly engineered a wind down designed to protect its partners and afford the SSC exorbitant salaries, all at the expense of its creditors. What remains of Coudert—particularly claims against its partners and those who assisted them—can only be liquidated fairly and competently by an independent trustee.

---

[1] Ms. Kane was also the pre-petition engineer for the transfer of the firm's work in process and practice groups to other firms for little or no consideration to the debtor.

## A. Background

1.  On September 22, 2006 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

2.  The Debtor is operating and winding down its business and managing its properties and affairs as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has yet been appointed.

3.  By Notice of Appointment dated October 10, 2006, the Office of United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") consisting of the following five creditors: (a) De Lage Landen Financial Services, Inc.; (b) Statek Corporation; (c) Lyman Garden Apartments, LLC; (d) The San Francisco Cannery, LLC; and (e) DC-1627 Eye Street Limited Partnership.

4.  The Court has jurisdiction over this motion pursuant to 28 U.S.C. sections 157 and 1334. Venue is proper pursuant to 28 U.S.C. sections 1408 and 1409. This matter is a core proceeding under 28 U.S.C. section 157(b)(2)(A).

5.  The statutory predicates for the relief requested herein is Section 1104 of the Bankruptcy Code and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## B. Relevant Facts Leading Up To The Decision To Wind Down

6.  The Debtor was engaged in the practice of law with its headquarters in New York City. In 2004, the Debtor had revenue of approximately $230 Million. In 2005, the revenue declined 30% to approximately $165 Million. See Statement of Financial Affairs dated September 22, 2006 (ECF Doc. # 3).

7.     The Debtor obtained working capital and other financing from the Banks, Citibank and JPMorgan Chase.  Until July of 2005, the Banks were secured primarily by Coudert's accounts receivable.

8.     Following the loss of numerous partners and a significant decline in revenue, the Debtor engaged in merger discussions with Orrick, Herrington & Sutcliffe ("Orrick") in early 2005.  After the negotiations failed to produce a transaction, the London and Moscow offices of Coudert defected to Orrick, dealing the firm a potentially fatal blow.

9.     By no later than the spring of 2005, the Debtor began to consider a wind down of its business.  In late May or early June 2005, certain individuals (including the firm's long time Executive Director, Patricia Kane) prepared a memorandum to the Coudert Executive Board entitled, "Orderly Dissolution Analysis" (the "Dissolution Analysis").  A copy of the Dissolution Analysis is attached as Exhibit A to the Declaration of Rosetta Packer (the "Packer Declaration").  The Dissolution Analysis projected that the liquidation of the Debtor's assets would generate proceeds of $89.626 million and that the liabilities would total $115.245 million. In other words, by June 2005, Coudert's management had concluded that the firm was insolvent by over $26 million on a balance sheet basis.

10.     By December 31, 2004, Coudert was in default of the financial covenants contained in its loan agreements with the Banks.  Around the time that the Dissolution Analysis was prepared, the Banks were owed in excess of $24.5 million[2].  The Banks became very concerned that they would not be repaid.  In a letter dated June 24, 2005, Citigroup indicated to the Debtor that:

> The Bank believes that the substantial number of partner departures and proposed closing and/or consolidating of a number of offices at considerable cost has greatly increased the risk to [Citibank] and JP

---

[2] Copies of the Security Agreements are attached as Exhibit B-1 and Exhibit B-2 to the Packer Declaration.

Morgan…Accordingly, the collateral package currently granted to the Banks should be expanded to include:

- Furniture/fixtures/equipment;
- Capital notes receivables;
- Leasehold interests; and
- Asset of related foreign entities supported by appropriate guarantees, as described above.

See Exhibit C to the Packer Declaration.

11.     Under the firm's Partnership Agreement dated as of December 31, 2004 (the "Agreement"), each partner was personally liable for all amounts owed to the Banks.  A copy of the Agreement is attached as Exhibit D to the Packer Declaration.  Article 3 Section (h)(6) of the Agreement provides: "[e]ach Partner shall be jointly and severally liable for the full amount of all of the Obligations of the Partnership owed to JP Morgan Chase Bank, outstanding from time to time as provided in the Chase Loan Agreements…" Article 3 Section (h)(7) of the Agreement provides: "[e]ach Partner shall be jointly and severally liable for the full amount of all of the Obligations of the Partnership owed to Citibank N.A. outstanding from time to time as provided in the Citibank Loan Agreements…"

12.     On July 25, 2005, the Debtor executed an amendment to the Security Agreements. Copies of the Amendment are attached as Exhibit E-1 and Exhibit E-2 to the Packer Declaration. The amendments, inter alia, expanded the collateral base of the Banks to include leasehold interests.  At that time, Coudert's leasehold interests included a long term lease of its New York office space (in the Grace Building) which lease had a fair market value of $18.0 million.

13.     On August 16, 2005, the partners of Coudert approved a special authorization (the "Wind-Down Authorization"), pursuant to which Coudert would commence the winding down of its business operations in an orderly fashion.  In furtherance of the same, the Executive Board of Coudert authorized the establishment of the SSC to effect the wind down of the firm's

operations.  The SSC originally consisted of three members, Andrew Hedden, Fred Konta and Anthony Williams.

14.     Between January 1 and August 31, 2005, the Debtor distributed over $28 million to its partners, consisting of alleged profits for that year and alleged undistributed profits for 2004[3].  See Exhibit F to Packer Declaration.  Despite clear indications that Coudert would be forced to wind down its affairs, no effort was made to create capital reserves, curtail spending or decrease partner draws.

## C.     The 13-Month Waiting Period

15.     Following the approval of the Wind-Down Authorization, the SSC began to sell off the Debtor's assets to different law firms.  In September of 2005, the Debtor transferred the assets comprising its New York office to Baker & McKenzie for the following consideration: (a) $8 million to assume Coudert's New York office lease (in stark contrast to the $18.0 million appraised value of this asset); (b) $5.5 million for Coudert's current work in progress; (c) $996,795 for leasehold improvements; (d) $1.0 million for fixed assets; and (e) a share of certain contingent fee matters.

16.     All three members of the SSC who were responsible for overseeing the wind down of Coudert joined Baker & McKenzie as partners.  Following this transfer, Messrs. Hedden and Konta resigned from the SSC.  Even though he had become a partner of Baker & McKenzie, Anthony Williams remained the sole member of the Coudert SSC.

17.     Once the Banks were adequately secured, and mechanisms were in place to ensure that every available dollar was devoted to repayment of the Banks' claims, Coudert was

---

[3] In or around June 2005, certain distributions to partners were recharacterized as undistributed profits for 2004. This financial slight of hand may have been intended to shield these payments from recapture.

determined to wait twelve months before filing bankruptcy realizing that its partners would be exposed to <u>prima facie</u> preferential transfer claims if it filed any sooner.

18.     While trying to wait out the preference period, very little effort or attention was paid to an orderly wind down or cost effective liquidation of the business.  While refusing to pay general creditors, the SSC and the wind down staff concentrated only on repaying the Banks as rapidly as possible.  The SSC was unable to control its partners, however, particularly those in foreign offices. In addition, Coudert reimbursed certain highly suspect expenses.  Among others, the following expenses were reimbursed following the Wind-Down Authorization:

| PARTNER | AMOUNT | DATE AND DESCRIPTION |
|---|---|---|
| Scogin, Hugh | $36,286.81 | September 2005-June 2006 Beijing Housing Subsidies |
| Roten, Russell W. | $20,000.00 | 9/23/2005 –Monthly Draw |
| Alpers, Bernward M. | $39,777.54 | 11/21/05 – Special Bonus Payment |
| Prieur, Landon | $15,840.84 | 6/22/2006 – Children's Tuition – second payment |
| Prieur, Landon | $10,007.69 | 11/23/2005 – Children's Tuition – second semester |
| Stephens, Christopher | $157.63 | 9/30/2005 Bus Devl - Foot massage |

<u>See</u> Statement of Financial Affairs (Payments to Partners 9/1/2005 through 8/31/2006), ECF Doc. #3

19.     Conditions at Coudert became so chaotic that individual partners in foreign offices began diverting money to separate personal deposit accounts, refusing to return the funds until their demands were met.  As of the Petition Date, more than $1.0 million has been taken from Coudert by disgruntled partners.

20.     By the end of 2005, Coudert was faced with substantial and mounting claims by creditors including several malpractice actions involving former clients that were seeking tens of millions of dollars in damages.  Coudert carried malpractice insurance with very high "retention" or deductible amounts, up to $5.0 million in each policy year.  As a result, continuing to defend

the firm from litigation, particularly malpractice claims, required the expenditure of substantial amounts of money.  Notwithstanding its lack of funds, Coudert chose to defend malpractice and other claims, even though a bankruptcy filing, which was inevitable and for which there was no benefit in delaying other than the hope of insulating partners, would substantially reduce or even eliminate litigation related expenses.  Such irrational behavior by the very people who now remain in control of the debtor served only to protect partners at the expense of Coudert's creditors.

21.     Moreover, even with the significant deductible amounts, no effort was made to reserve the funds necessary to defend claims by creditors.  Rather, Coudert remained focused on the singular goal of repaying Bank debt for which its partners were personally liable.

22.     During the 13 month period between the Wind-Down Authorization and the Petition Date, Coudert was so cash constrained that it could not even afford to file law suits to collect its substantial outstanding accounts receivable.

23.     On July 31, 2006, Anthony Williams, the sole remaining member of the SSC, resigned from his position.  Mr. Williams designated: (a) Patricia Kane (who had been the Executive Director of Coudert for many years, had overseen the wind down, and facilitated the many asset transfers described, and who reported to the SSC); (b) Charles Keefe (a former Coudert partner); and (c) Eddy W. Friedfeld, Esq. (an attorney previously unaffiliated with Coudert); as his successors on the SSC.

24.     In addition to significant pay raises that were awarded on October 1, 2005, Coudert awarded each member of its wind down team with a written employment agreement that afforded them substantial severance and other benefits approximately one week before filing

bankruptcy. Copies of the Employment Contracts are attached as <u>Exhibit G</u> to the Packer Declaration.

25.     Members of the SSC are presently compensated as follows:

    a.     Patricia Kane—$500,000 per year (plus benefits)

    b.     Charles Keefe—$240,000 per year (plus benefits)

    c.     Eddy Friedfeld—$120,000 per year

In addition, the Debtor is paying its CFO, James Rees, $312,000 per year (plus benefits).

26.     Despite the Debtor's insolvency as projected in the Dissolution Analysis, the SSC waited 13 months after its appointment to file for bankruptcy protection. By waiting the 13-month period, the SSC planned to extinguish an important remedy that would bring money into the estate—namely, the ability of creditors or a trustee to recover the value of pre-petition transfers including the collateral pledged to the Banks— and effectively dissipated the debtor's cash in payment of unnecessary and exorbitant overhead.

**E.     <u>Snapshot Of The Debtor On The Petition Date</u>**

27.     In its Schedules, the Debtor asserts that it is "solvent".[4] Specifically, the Debtor lists assets of $29.968 million against liabilities of $18.261 million, reflecting a net worth of approximately $11.7 million. Yet, the Schedules fail to reflect <u>any</u> liability for several potentially large claims. For example, the landlords with the largest claims (such as: (a) DC-1627 Eye Street Limited Partnership; (b) Equity Office Properties; and (c) The San Francisco Cannery, LLC) are listed in "unknown" amounts. These creditors asserted prepetition claims exceeding in the aggregate $15 million. In addition, significant malpractice claims (including

---

[4] The Committee eagerly anticipates the Debtor's response as to how it improved its balance sheet from a net worth of negative $26 million (June, 2005) to a postive $11.7 million (the Petition Date).

David K. Gottlieb as Trustee for Grenada Hills and Statek Corporation) are listed in unknown amounts. The parties asserting these claims seek in excess of $80 million.

28.     Even the law firms retained by the Debtor had no confidence in the Debtor's stated solvency.  Two law firms (Wilson Elser Moskowitz Edelman & Dicker LLP and Stein & Lubin, LLP) demanded security interests and were granted liens against accounts receivable just days before the bankruptcy.  Most telling perhaps, the Debtor's bankruptcy counsel was so concerned about the solvency of its client that it insisted on a pledge of the Debtor's art collection (which pledge was later released at the insistence of the United States Trustee).

**F.     Misleading Statements By The SSC**

29.     In connection with the Debtor's filing for bankruptcy, Ms. Kane swore in her Rule 1007 Affidavit as follows:

> The Debtor believes that it is solvent on a balance sheet basis.  On Schedule B, the Debtor has placed conservative valuations on its client accounts receivable, providing significant allowances for doubtful or difficult collections.  In addition, the Debtor has assigned a $10 million approximate value to expected receipt of contingency fees (which in fact may be significantly in excess of that amount when collected) in matters pending against the United States of America, the State of Virginia, and other defendants…. It is anticipated that these matters will come to a resolution over the next two years, and if successful, will produce fees of a magnitude that may provide for a full recovery by Coudert's creditors and a dividend to Coudert's partners.

See 1007 Affidavit at ¶ 24.

30.     In contradiction to this statement, Pat Kane testified under oath as follows in a malpractice action in May of 2006:

> Q:     Now, my question to you is: part of this liquidation is potentially for the benefit of the partners of the firm, isn't that correct?
>
> A:     Potentially is the correct word.
>
> Q:     I think that's what my question was.

> A:    Potentially.
>
> Q:    And your intentions is to get enough money to get the creditors and then give money to the partners; isn't that correct?
>
> **A:    There will be no money for the partners.**

Exhibit H to Packer Declaration, Cross-Examination of Patricia Kane, May 5, 2006 5:18-27 (emphasis supplied).

> Q:    So, as of today, May 2006, does Coudert have the ability to pay all of its existing obligations?
>
> A:    No.

Id. Direct Examination of Patricia Kane, May 5, 2006 88:18-21.

**G.    Conflicts Of The SSC**

31.    As part of its fiduciary duties, the SSC must scrutinize all prepetition sale transactions and other claims that may be brought against lawyers and law firms to which (or for whose benefit) assets of Coudert were transferred.  Because the SSC negotiated these transactions and has ties to the former Coudert Partners, it is simply unable to examine the transactions with any degree of independence.

32.    Prior to the Petition Date, certain creditors asserted claims of mismanagement against the SSC.  Specifically, on August 11, 2006, the San Francisco Cannery, LLC, filed a complaint against Pat Kane, Charles R. Rankin and John Does 1-500.  A copy of the complaint is attached as Exhibit I to the Packer Declaration.  Paragraph 12 of the Complaint alleges that:

> While Coudert Brothers was insolvent, Defendants failed to operate its business for the benefit of creditors and in so doing wasted assets of Coudert Brothers in having failed to set aside sufficient assets to pay creditor's claims before they paid themselves.

33.     Upon learning of this action, the Committee sent a letter dated October 25, 2006, to the Debtor's counsel.  A copy of the October 25th letter is attached as <u>Exhibit J</u> to the Packer Declaration.  The Committee requested that the Debtor investigate this cause of action and inform the Committee within thirty (30) days whether it intends to pursue this cause of action. To date, the Debtor has not responded to the October 25th letter.

34.     The SSC will also need to determine whether avoidance and other claims should be pursued against partners and others, among other things, to recover pre-petition distributions and other transfers.  Given its relationship to and role in the pre-petition conduct giving rise to such claims, the SSC must be replaced with an independent party.

**H.      Post-Petition Waste and Mismanagement**

35.     Indeed, as of the Petition Date, the Debtors employed twelve people, only four of whom cost the estate nearly $100,000 in salary each month.  Together with rent and other obligations, the Debtor's post-petition overhead exceeds $3.0 million annually -- a staggering figure given the limited tasks remaining to be accomplished.  Immediately after its formation, the Committee (first through counsel and later through its financial advisor) met with the Debtor and urged the Debtor to scale back expenses.  Rather than making obvious and essential cost cuts, the Debtor used the Committee's desire for change as a means to negotiate continued compensation during a period of transition.  The Debtor's refusal to make needed changes occurs at a time when Coudert cannot even pay basic expenses such as post-petition rent as required by the Bankruptcy Code.

## Basis For Relief

**A.** **Cause Exists For The Appointment Of A**
**Chapter 11 Trustee Under Section 1104(a)(1)**

36.     Section 1104(a) of the Bankruptcy Code provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1)     for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

> (2)     if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (3)     if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

37.     A chapter 11 trustee may be appointed if there is "cause" or if the "appointment is in the interest of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. section 1104(a)(1) and (2).   Pursuant to Bankruptcy Code section 1104(a), courts have broad discretion in determining whether to appoint a Chapter 11 trustee, and may even do so <u>sua sponte</u>.  <u>See</u> <u>In re Wings Digital Corp.</u>, 2005 WL 3789334 at *4 (Bankr. S.D.N.Y. 2005).  The party requesting the appointment of a trustee has the burden of proof in demonstrating "cause."  <u>See</u> <u>In re Ionosphere Clubs, Inc.</u>, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

38.     Under section 1104(a)(1), the party requesting the appointment of a trustee must demonstrate fraud, dishonesty, incompetence or gross mismanagement of the affairs of the

debtor by current management, either before or after the commencement of the chapter 11 case. See In re Adelphia Communications Corp., 342 B.R. 122, 129 (S.D.N.Y. 2006); In re United States Communications of Westchester, Inc., 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991). Going further, the inquiry into whether "cause" exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to "similar cause." Factors which courts have looked to in determining whether to appoint a trustee include:

      a.    materiality of the misconduct;

      b.    evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;

      c.    the existence of prepetition voidable preferences or fraudulent transfers;

      d.    unwillingness or inability of management to pursue estate causes of action;

      e.    conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and

      f.    self-dealing by management or waste or squandering of corporate assets.

See In re Nartron Corp., 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005) (ruling cause included, inter alia, failure of debtor to preserve or pursue avoidable transfer for benefit of estate).

      39.    Here, the grounds for cause include: (a) the deliberate effort by the SSC to wait longer than a year after Coudert made its decision to wind down, thereby reducing the exposure of its partners to certain avoidance actions and compromising its ability to satisfy claims of creditors; and (b) the SSC's gross mismanagement of the Debtor (both pre and post petition) to the detriment to the Debtor's unsecured creditors.

40.     Rather than file a bankruptcy petition and expose partners to potential preference claims, the SSC waited slightly over a year—just long enough for preference claims against partners to lapse[5].  By doing so, the SSC abdicated its duties to all creditors since the Debtor was obviously in the "zone of insolvency"—if not actually insolvent.  In this regard, this chapter 11 case is not unlike cases where "cause" under section 1104(a)(1) was found when the debtor's management breached its fiduciary duty by unjustifiably failing to institute a suit to recover a voidable preference or fraudulent transfer.  See, e.g., In re Sharon Steel Corp., 871 F.2d 1217, 1228 (3d Cir. 1989)(finding "cause" in management's failure to discharge fiduciary duty to pursue prepetition voidable transfers when debtor corporation and transferees shared common management); NBD Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters., Inc.), 151 B.R. 189, 194–95 (Bankr. N.D. Ill. 1993)(holding debtor in possession breaches its fiduciary duties to creditors of estate if it "unjustifiably fails to institute a suit to recover a voidable preference"); In re Holly's, Inc., 140 B.R. 643, 686 (Bankr. W.D. Mich. 1992)(finding cause for appointment of trustee where debtor breaches fiduciary duties); In re William Vaughan & Co., Inc., 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984)(determining appointment of trustee appropriate following debtor's failure to commence proceedings for avoidance of transfer where transfer was to debtor's president and would not likely be subjected to scrutiny).

41.     Gross mismanagement is also sufficient "cause" to appoint a chapter 11 trustee. See, e.g., In re Colby Constr. Corp., 51 B.R. 113, 117 (Bankr. S.D.N.Y. 1985)(finding "cause" upon, inter alia, majority shareholder's depletion of debtor's assets to pay exorbitant membership dues in his various clubs and for lavish Christmas party, while at same time not fully paying

---

[5] Although pledging additional collateral to the Banks may not have exposed Coudert's lenders to ordinary preferential transfer claims, absent a bankruptcy filing within 90 days, partners of the firm had preference exposure for a full year under sections 547(b) and 550(a) of the Bankruptcy Code (permitting preferential transfer actions against those for whose benefit a transfer is made rather than the immediate transferee).

subcontractors funds received on their behalf); <u>In re McCorhill Pub., Inc.</u>, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987)(finding "cause" upon debtor's "gross mismanagement" in failure to maintain complete and accurate financial records and substantiate undocumented transactions).

42.     The Debtor's Statement of Financial Affairs is replete with examples of mismanagement by the SSC during the 13-month wind-down period.  Specifically, permitting the continuation of partner draws during 2005 with knowledge of the firm's inevitable dissolution and reimbursing unnecessary "business" expenses like massages and tuition for children of partners is mismanagement sufficient to justify the appointment of a trustee.  In <u>Colby Construction</u>, the bankruptcy court determined that there was "cause" when the majority shareholder's depleted the debtor's assets to pay exorbitant membership dues in his various clubs and for a lavish Christmas party, when not fully paying subcontractors the funds received on their behalf.  <u>See</u> 51 B.R. at 117

43.     Similarly, just as the SSC members oversaw "conflicted transactions", such as the sale of the New York City office to Baker & McKenzie, in which all three members of the SSC were to join the transferee law firm as partners, the <u>McCorhill</u> court cited the fact that "the principals of the debtor occup[ied] conflicting position in the transferee companies" was ground for appointment of a trustee.  <u>See</u> 73 B.R. at 1017.

44.     Finally, apparently no effort was made by the SSC to create a capital reserve to cover wind down expenses or critical items such as the firm's pension plan or retainers for professionals needed to facilitate the wind down.  The cash position of the firm immediately prior to the filing was so poor that law firms engaged for Coudert's imminent bankruptcy were forced to accept liens against assets, including the firm's art collection, instead of cash retainers.

45.     Following the departure of the SSC to Banker & McKenzie, the Debtor was left with management insufficiently competent to conduct a business operation in furtherance of its fiduciary duty to its creditors.  See In re United States Communications of Westchester, Inc., 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991).  Indeed, as of the Petition Date, the Debtors employed twelve people, only four of whom cost the estate nearly $100,000 in salary each month. Together with rent and other obligations, the Debtor's post-petition overhead exceeds $3.0 million annually -- a staggering figure given the size of this estate, its limited resources, and the remaining tasks to be done.  Immediately after its formation, the Committee (first through counsel and later through its financial advisor) met with the Debtor and urged the Debtor to scale back expenses.  Rather than making obvious and essential cost cuts, the Debtor decided to ignore its fiduciary duty and to use the protection temporarily afforded under the Bankruptcy Code as leverage with which to negotiate transition pay for a top heavy and over compensated wind down staff.  The Debtor's refusal to make needed changes occurs at a time when Coudert has little or no money and cannot even pay its monthly post-petition rent as required by the Bankruptcy Code.

46.     Given this miserable track record, the SSC should not be left in place to continue to operate the affairs of the Debtor.  Cause exists to appoint a chapter 11 trustee.

**B.      The Appointment Of A Chapter 11 Trustee Under Section
        1104(a)(2) Is In The Best Interest Of Creditors**

47.     Section 1104(a)(2) of the Bankruptcy Code offers a flexible standard for the appointment of a trustee if the court determines that such an appointment "would be in the best interests of creditors, equity security holders, and other interests of the estate."  In re Microwave Prods. of Am., Inc., 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989)(citations omitted)(granting motion to appoint trustee on basis of "considerable and continuing erosion of confidence in the

19

debtor and its board of directors to operate the company"); see also Ionosphere Clubs, 113 B.R. at 168; Sharon Steel, 871 F.2d at 1226; Committee of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987).

48.     Section 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no "cause" exists.  See 124 Cong. Rec. H11, 102 (daily ed. Sept. 28, 1978)("the twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors"); see also In re Sharon Steel Corp., 871 F.2d at 1226; Ionosphere Clubs, 113 B.R. at 168.

49.     The appointment of a chapter 11 trustee under section 1104(a)(2) to administer this case is appropriate for several reasons.  First, an independent fiduciary is best situated to investigate the circumstances that led to the Debtor's demise and to determine if the estate has claims against others that may be pursued for the benefit of creditors.  The bankruptcy estate also may have claims against former management and others arising from misconduct.  A debtor in possession is seldom the proper party to conduct this type of investigation, because the investigation might delve into the conduct of recent or current members of the debtor's management team.  An independent trustee will not be hampered by real or apparent loyalties in determining if causes of action exist and if sources of recovery are available for the estate.

50.     Second, because the Debtor's business operations have been largely curtailed, a trustee should be appointed to complete the liquidation of the estate and to perform the traditional bankruptcy tasks of receivables collection, miscellaneous asset disposition, claims administration and distribution.

51.     Finally, a trustee should be appointed to both pursue and defend litigation on behalf of the estate.  There are a number of malpractice cases pending against the Debtor.

Claims can best be evaluated and, if necessary, litigated, by a dispassionate, independent trustee. A trustee is also the appropriate party to pursue any claims the estate may have against insiders of the Debtor. The trustee's independence will permit the pursuit of all possible avenues of recovery without any potential taint of self-interest.

52. Courts have ordered the appointment of trustee under section 1104(a)(2) as being in the "best interest of estate" when the debtor (like the SSC here) failed to make any effort to preserve preferential transfer claims due to conflicts of interest. See In re Tel-Net Hawaii, Inc., 105 B.R. 594, 595 (Bankr. D. Haw. 1989); see also Sharon Steel, 871 F.2d at 1226 (applying flexible standard under section 1104(a)(2) to allow appointment of trustee even when no enumerated "cause" exists).

53. Most recently, in In re Wings Digital Corp., 2005 WL 3789334 (Bankr. S.D.N.Y. 2005), Bankruptcy Judge Gropper appointed a chapter 11 trustee under section 1104(a)(2) when none of the factors enumerated under section 1104(a)(1) had been clearly established by the movant, but the debtor was clearly unable to discharge its fiduciary duties. See id. at * 7 (citing In re Bellvue Place Assocs., 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994)).

54. In this case, the Debtor is a liquidating company and the SSC lacks credibility to continue the wind down of the Debtor's affairs. Therefore, appointing a chapter 11 trustee pursuant to section 1104(a)(2) would be well within the Court's exercise of discretion.

### Waiver of Memorandum of Law

55. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Committee respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

## No Prior Request

56.     No previous motion for the relief sought herein has been made to this or any other court.

## Notice

57.     Copies of the Motion will be sent to (i) counsel for the Debtor, (ii) the Office of the United States Trustee for the Southern District of New York, and (iii) all other persons that have requested notice or copies of pleadings filed in these cases.

**<u>Conclusion</u>**

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that this Court enter an order, substantially in the form submitted herewith; (i) appointing a Chapter 11 trustee and (ii) granting such other and further relief as is just and proper.

Dated: December 8, 2006
       New York, New York

                                    McCARTER & ENGLISH, LLP
                                    Attorneys for the Official Committee of Unsecured
                                    Creditors of Coudert Brothers LLP

                                    /s/ David J. Adler
                                    David J. Adler  (DA-0048)
                                    Rosetta Packer*  <u>Pro Hac</u> Admission Pending
                                    245 Park Avenue
                                    27th Floor
                                    New York, New York 10167
                                    (212) 609-6800 - Telephone
                                    (212) 609-6921 – Facsimile