KLESTADT & WINTERS, LLP
Tracy L. Klestadt (TK-3591)
John E. Jureller, Jr. (JJ-4697)
Sean C. Southard (SS-2825)
Attorneys for Coudert Brothers LLP
Debtor and Debtor in Possession
292 Madison Avenue, 17th Floor
New York, New York 10017
Telephone no. (212) 972-3000

**Hearing Date:**
**December 20, 2006**
**10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ :
                                                       :
In re:                                                 : Chapter 11
                                                       :
COUDERT BROTHERS LLP,                                  : Case No. 06-12226 (RDD)
                                                       :
                                   Debtor.             :
                                                       :
------------------------------------------------------ :

### DEBTOR'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Coudert Brothers LLP (the "Debtor"), debtor and debtor-in-possession, by its attorneys Klestadt & Winters, LLP, respectfully submits this memorandum of law in opposition ("Opposition") to the motion (the "Section 1104 Motion" or the "Motion") of the Official Committee of Unsecured Creditors (the "Committee") seeking the appointment of a chapter 11 trustee pursuant to section 1104(a) of title 11 of the United States Code (the "Bankruptcy Code").

### PRELIMINARY STATEMENT

Application of the plain meaning of § 1104 of the Bankruptcy Code mandates denial of the Committee's Motion. The Committee's Motion is premised entirely upon false assumptions and misstatements of fact. By filing the Motion, the Committee has simultaneously bared its litigious soul and overplayed its statutory role in this case.

Rather than monitoring and participating in the chapter 11 process to ensure a fair, maximum distribution to unsecured creditors, the Committee has sought to usurp the Debtor's role and frustrate the Debtor's legitimate efforts at liquidation of its assets for the benefit of the estate. The Debtor need not lower itself and retort in the mud-slinging style of the Motion, as it is clear that the Committee has not and will not meet its burden of proof in support of same.

Without first meeting with the Debtor's current wind-down team despite repeated offers (and later requests) for the same, and despite being provided with virtually all documents requested[1], the Committee drew conclusions about current management from a high altitude vantage point. Notice of the Section 1104 Motion was not served upon all creditors or parties in interest, despite their obvious interest in the results of the Committee's efforts. It is not even apparent from the Motion whether any consideration was given to the cost to be borne by the Debtor's estate if the Committee were successful in having a chapter 11 trustee appointed. Rather, the Committee has charged into this Court seeking to oust current management, appointed to their respective posts on July 31, 2006, based upon a theory that amounts to little more than the Committee's perceived taint. The Debtor respectfully suggests that the Committee's perception is not sufficient to carry the day and cause this Court to exercise the extraordinary remedy of appointment of a chapter 11 trustee.

As discussed below in detail, the members of the current management of the Debtor display the expertise and knowledge required to best guide the Debtor through the

---

[1] On Sunday, December 17, 2006, at 10:04pm, counsel for the Committee served by e-mail document requests and notices of depositions. Substantially all of the documents requested have been previously provided to the Committee.

bankruptcy process and augment the estate for the benefit of all creditors. Indeed, the record reflects that the Debtor, by and through its counsel, has filed a plenitude of motions, discussed below, and launched an aggressive litigation strategy to recover estate assets. The Debtor intends to move swiftly toward a plan of liquidation in this case and is hopeful that the Committee can be an effective participant in that plan process.

## STATEMENT OF FACTS

The Court and parties in interest are respectfully referred to the affidavit of Pat Kane dated December 18, 2006 (the "Kane Affidavit") for a full recitation of the facts relevant to the Section 1104 Motion. This Opposition will refer to the Kane Affidavit at various points to provide evidentiary support for the arguments of the Debtor.[2]

As stated above, Coudert is a limited liability partnership, organized under the laws of the State of New York. Founded in 1853, Coudert was built into a great legal institution with broad international reach. At its peak, Coudert maintained 28 offices in 15 countries and employed over 1,350 persons (exclusive of partners). Prior to determining to wind down its operations on August 16, 2005, Coudert had approximately ninety-three (93) "Equity Partners," twenty-two (22) "Contract Partners," and seventy (70) "Retired Partners," all as defined in the firm's Partnership Agreement. In addition, Coudert employed 285 attorneys (exclusive of partners) and 575 non-attorney staff.

Upon commencing its Wind Down, the decision making authority of the firm was passed to the SSC, created by the firm's prior Executive Board. As set forth in more detail in the Kane Affidavit, the SSC took charge of the firm's Wind Down and accomplished much during the approximately thirteen month period between August of

_____

[2] Capitalized terms not otherwise found herein shall have the meanings ascribed to the same in the Kane Affidavit.

2005 and the commencement of the instant chapter 11 case on September 22, 2006 (the "Petition Date").

On July 31, 2006, Anthony Williams, then sole member of the Debtor's SSC, resigned from his position. Before resigning and pursuant to the Wind-Down Authorization, Mr. Williams designated (i) Ms. Kane (the Executive Director of Coudert for approximately 15 years), (ii) Charles B. Keefe, Esq. (a former Coudert partner), and (iii) Eddy W. Friedfeld, Esq. (an attorney previously unaffiliated with Coudert who possesses substantial insolvency and restructuring experience), as his successors on the SSC. As such, since July 31, 2006 and continuing after the Petition Date, the decision making authority for the Debtor has been vested in a fully-functioning three member committee consisting of Ms. Kane, Mr. Keefe[3] and Mr. Friedfeld.

## ARGUMENT

Through the Section 1104 Motion, the Committee seeks the appointment of a chapter 11 trustee pursuant to sections 1104(a)(1) and (2) of the Bankruptcy Code. Section 1104(a) of the Bankruptcy Code provides, in relevant part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest of the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

---

[3] Mr. Keefe also serves as General Counsel to the Debtor.

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

\* \* \*

11. U.S.C. §1104 (2006).

As the Second Circuit has noted, "the standard for § 1104 appointment is very high." In re Smart World Techs., LLC, 423 F.3d 166, 176 (2d Cir. 2005) (dicta). The appointment of a Chapter 11 trustee is an "extraordinary remedy." In re Adelphia Communications Corp., 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006) (denying motion to appoint trustee), aff'd, 342 B.R. 122 (S.D.N.Y. 2006); In re North Star Contracting Corp., 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) (denying appointment of trustee); In re Dragone, 266 B.R. 268, 271 (D. Conn. 2001) (affirming denial of motion for trustee); In re W.R. Grace & Co., 285 B.R. 148, 158, 160 (Bankr. D. Del. 2002) (denying motion to appoint trustee, recognizing that "appointing a trustee must be considered a last resort"); 7 Collier on Bankruptcy ¶ 1104.02[2][a] (trustee appointed pursuant to § 1104 only in "extraordinary cases").

The appointment of a trustee is "the exception, rather than the rule." Adelphia, 336 B.R. at 658; Dragone, 266 B.R. at 271. "[I]t is presumed that a Chapter 11 debtor will remain in possession and control of its assets during the pendency of a bankruptcy proceeding," and therefore "courts will grant relief under § 1104(a) only in extraordinary cases." In re Fairwood Corp., 2000 U.S. Dist. Lexis 2606, at *15 (S.D.N.Y. Mar. 9, 2000) (affirming bankruptcy court's denial of motion to appoint trustee), aff'd, 242 F.3d 364 (2d Cir. 2001); see also In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001)

(denying motion to appoint trustee given the "strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case").

The Committee has the burden of proving by "clear and convincing evidence" that the appointment of a trustee is warranted. Adelphia, 336 B.R. at 656; In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); see also, e.g., In re G-I Holdings, Inc., 385 F.3d 313, 318-19 (3d Cir. 2004); In re Westek Georgia, LLC, No. 03-55298 (RFH), 2004 WL 1092326, at *1 (Bankr. M.D. Ga. May 14, 2004) ("Most courts hold that the showing" that appointment of a Chapter 11 trustee is warranted "must be by clear and convincing evidence.").

## A.     "Cause" Cannot Be Established Under Bankruptcy Code § 1104(a)(1)

The Section 1104 Motion purports to seek relief pursuant to section 1104(a)(1) of the Bankruptcy Code for "cause," defined therein as "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." The Section 1104 Motion does not and cannot identify or support with evidence, any of the misconduct enumerated in the statute. Current management -- the current members of the SSC -- has engaged in nothing short of laudatory stewardship of this case and the Debtor's estate.

As support for its position that a chapter 11 trustee should be appointed for cause, the Committee offers two baseless lines of argument. First, the Committee concludes that the Debtor, through the SSC, waited more than one year to file a bankruptcy petition solely to benefit the Debtor's former partners over its non-partner unsecured creditors. Second, the Committee asserts that the Debtor and its estate were grossly mismanaged by the SSC. Both are addressed below, and are equally unpersuasive and unsupported.

### 1)    <u>Intentional Delay of Bankruptcy Filing To Protect Former Partners</u>

The Committee's argument in support of its conclusion that the Debtor intentionally delayed an inevitable bankruptcy filing solely to extinguish potential preference claims against the Debtor's former partners is fatally flawed in that it lacks even the most basic supporting evidence. Moreover, the Committee is simply wrong on the facts.[4] As set forth in detail in the Kane Affidavit, the situation on the ground during the Wind Down was constantly evolving. A determination to commence a chapter 11 case was never the simple and obvious choice that the Section 1104 Motion implies was there to make. It is only through its willful ignorance, evidenced by its refusal to meet with the SSC, that the Committee is able to maintain such an argument.[5]

It was the working assumption through much of the prepetition period that a chapter 11 process would be unduly expensive and would unnecessarily depress the Debtor's asset values, which largely depended upon maintaining cohesive units of attorneys by office or practice groups and collection of accounts receivable. <u>See</u> Kane Affidavit at ¶ 11. By contrast, the Committee's arguments all assume that a bankruptcy was inevitable for the Debtor and that this conclusion was foreseeable from great distances. However, the Section 1104 Motion fails to articulate an accurate timeline of events during the prepetition period and further fails to identify at what point the Committee believes that, with the benefit of 20/20 hindsight, the Debtor must have filed a bankruptcy petition to discharge its fiduciary duties. As is clear from the Kane Affidavit,

---

[4] Interestingly, the Committee does not explain in detail the claims against former Coudert partners that it would have this Court believe the Debtor plotted and schemed to defeat.

[5] Only after filing the Section 1104 Motion has the Committee indicated that it requires discovery from the Debtor and third parties.

the Debtor appropriately discharged its fiduciary duties to creditors during the prepetition period and made substantial progress toward its acknowledged responsibility and goal of maximizing value, including reduction of liabilities through negotiations, completion of practice group sales, and collection of receivables.

As is likewise clear from the Kane Affidavit, the concept of intentionally stalling in order prevent partner avoidance actions was never discussed by the Executive Board before the Wind Down nor by the SSC after it took over.  <u>See</u> Kane Affidavit at ¶ 41. The suggestion to the contrary by the Committee in the Section 1104 Motion without so much as a shred of hard evidence, borders on being a violation of Federal Rule of Bankruptcy Procedure 9011.

Though as a legal matter, chapter 5 actions do not come into existence until an order for relief is entered in a bankruptcy case and therefore the SSC could not possibly be found to have wasted an asset of its estate by merely failing to file earlier for chapter 11, it bears considering exactly what chapter 5 actions the Committee is concerned have been lost.  From these rather cryptic references in the Motion, it appears that the Committee is concerned that insider preference actions under sections 547 and 550 of the Bankruptcy Code against the former partners of the Debtor do not exist because the Debtor did not file chapter 11 earlier.  Assuming for the sake of argument that the Debtor had chosen to file on December 31, 2005, when the Committee suggests that claims were mounting against the Debtor and the writing was on the wall, the Debtor would have been left with one year to look back under section 547 to determine if any *prima facie* preferences existed against its partners.  To be successful in recovering the value of such payments, the Debtor must have determined and later proven that it was insolvent for the

entire year period.[6]  Moreover, partners would need to be found wanting of traditional defenses such as ordinary course, new value and contemporaneous exchange with respect to the services and business they generated during that same period of time.

As is clear from the Kane Affidavit, the Debtor was not in violation of its loan covenants with the Banks as of December 31, 2004.  The Section 1104 Motion suggests that the loss of the partners in the London and Moscow offices of Coudert (which the Kane Affidavit clarifies was on or about May 18, 2005), dealt the firm a "potentially fatal blow." See Motion at ¶ 8.  This suggestion appears not to be accurate given, inter alia, the merger possibilities as late as July, 2005 and going concern of the Debtor until that point.  However, even if one were to suggest that on a balance sheet basis, the loss of these partners in May, 2005 was the tipping point on the firm's solvency, only partner payments made after that date would be subject to recovery on a preference theory.

The Section 1104 Motion suggests that the $28 million was distributed during the period between January 1, 2005 and August 31, 2005, citing to the 2005 tax return.  Of that $28 million, approximately $8.3 million was distributed to partners after May 18, 2005 (approximately $7.8 million of which represents Monthly Partner Draws for June, July and August, 2005).  Therefore, under even a best case scenario with no defenses as to solvency, ordinary course, new value, or contemporaneous exchange, the Debtor's potential recovery would be capped at that amount.

---

[6]     The Committee is aware that there are certain contingency fee cases pending which, if successful, could result in many millions of dollars in recoveries for the Debtor's estate.  The contingency fee actions are primarily against the United States of America, and similar prior cases have been successful.  The Court is respectfully referred to the accompanying affidavit of Mr. Keefe for a detailed explanation of the contingency fee cases.  The Debtor believes that the projected recoveries must be factored into any analysis of the solvency of the Debtor.

Reasonable persons familiar with bankruptcy matters will likely agree that such a preference recovery theory against partners was not certain to result in any substantial recovery. The fact is that extinguishment of potential claims against the partners (and any other recipients of value from the Debtor) is nothing more than coincidence and certainly does not amount to the suggested cloak and dagger conduct contained in the Section 1104 Motion. To argue that a bankruptcy filing should have been made to preserve the potential value of uncertain avoidance actions while likely sacrificing the millions of dollars of tangible asset value preserved and achieved by the SSC during the Wind Down is myopic and demonstrates the dysfunction of this Committee.

The Committee has made every effort to twist and cram the prepetition facts set forth in the Section 1104 Motion in order that they might mimic the story line of the Third Circuit's opinion in In re Sharon Steel Corp., 871 F.2d. 1217 (3d Cir. 1989). Even the nautical analogies used in the Section 1104 Motion are borrowed from the Third Circuit. Id. at 1226. In Sharon Steel, the fact that postpetition management was directly involved in egregious and obvious prepetition fraudulent transfers seems to have carried the day for the official committee in that case. Id. at 1220-21. The Third Circuit affirmed in that case by doing little more than noting that it was constrained by very colorful findings concerning the bad acts of postpetition management during the prepetition period.

However flowery the language of the Section 1104 Motion may be, the Committee's sole evidence supporting a finding of bad faith by the pre-petition SSC and/or Executive Board of the Debtor is simply the amount of time it took to commence a voluntary bankruptcy proceeding. The Committee simply ignores the details of the day-

to-day Wind-Down during the so called "13 Month Waiting Period." <u>See</u> Motion at Section C, ¶¶ 22, 26. Moreover, the Committee then makes a leap of logic in suggesting that the three member SSC established on July 31, 2006, just weeks before the Petition Date, is unfit for its role in this case because of the prior SSC's having, in its view, intentionally failed to file a bankruptcy petition. No evidence of intent is offered, it is simply concluded by the Committee. The Debtor respectfully suggests this is not the clear and convincing evidence found in <u>Sharon Steel</u>, nor the makings of a trustee motion.

The Committee then goes on in the Section 1104 Motion to misquote the holding of <u>NBD Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters., Inc.)</u>, 151 B.R. 189, 194-95 (Bankr. N.D. Ill. 1993), for the proposition that a debtor breaches its fiduciary duty to creditors if it unjustifiably fails to institute a suit to recover a voidable preference. <u>See</u> Motion ¶ 40. Though the proposition for which it is cited may be correct in the abstract, the <u>SRJ</u> opinion really just considers the proper remedy to address a debtor's perceived conflict of interest and examines the differences and benefits of derivative standing for creditors under section 105 of the Bankruptcy Code versus the appointment of an examiner under section 1104 of the Bankruptcy Code. Interestingly, the <u>SRJ</u> court notes that it "has the discretion" … "to order the appointment of a trustee or examiner, or to permit third party derivative standing, whichever remedy is deemed in the better interest of the estate." <u>See</u> <u>id</u> at 195; <u>see also</u> <u>In re STN Enterprises</u>, 779 F. 2d 901, 905 (2nd Cir. 1985) (noting that a cost-benefit analysis is necessary when determining whether to appoint trustee or allow committee to sue).

## 2) Gross Mismanagement of the Debtor

The Committee's second line of attack in asserting "cause" under section 1104(a)(1) relates to its perception that the SSC grossly mismanaged the debtor during the Wind Down to the detriment of unsecured creditors. The Section 1104 Motion makes untrue statements of asserted fact in support of this argument that likewise fail for lack of supporting evidence.

For arguments related to "gross mismanagement," the Committee relies upon cases like In re McCorhill Publishing, Inc., 73 B.R. 1013 (Bankr. SDNY 1987). In that case, the debtor's principals (1) had conflicting interests in various affiliated non-debtor entities that shared an office suite with the debtor and exchanged expenses and obligations between the entities, (2) received undocumented loans from the debtor, (3) failed to produce even basic financial records, and (4) authorized postpetition payments of prepetition obligations without bankruptcy court approval. Id at 1017. Based upon these facts, the bankruptcy court rightly concluded to appoint a trustee. How the Committee can even consider the McCorhill case to be analogous to the instant facts is a mystery. Here, the Debtor and the SSC maintain pristine record keeping, have voluntarily opened its books and records for the Committee without debate, and routinely offered (and continue to offer) to meet with the full Committee to confer about case strategy and answer questions about the prepetition Wind Down.

The Committee also cites In re Colby Construction Corp., 51 B.R. 113 (Bankr. S.D.N.Y. 1985) as support for its theory of "gross mismanagement" requiring appointment of a trustee. However, the facts of the Colby case are not even closely on

point with the case at bar.  In that case, the court correctly appointed a trustee as the principals of the company engaged in open and obvious deceit and actual fraud, including (1) using company funds to acquire another company in the principal's own name, (2) withdrawing funds for personal use under the guise of a loan and thereafter not repaying the loans back to the company, (3) violating the New York Lien Law as a general contractor by failing to deposit and account for funds owed to subcontractors as required by law, and furthermore, (4) finding that the corporation's books and records were in "disarray" and failed to account for shortfalls.  <u>See</u> id at 115. The country club membership and lavish Christmas party referenced in <u>Colby</u> and trumpeted by the Committee in the Section 1104 Motion, was only icing on the cake and clearly not the main reason for the court's appointment of a trustee.  The Committee is again intentionally missing, or otherwise ignorant to, the crucial facts of the Debtor's case.

a)      <u>Prepetition Period</u>

The Committee asserts that by (1) allowing continuation of partner draws and reimbursing unnecessary expenses during 2005 with the alleged knowledge of the firm's inevitable dissolution, (2) negotiating transactions involving conflicts of interest, and (3) failing to create a capital reserve to cover wind down expenses, like pension plan or retainers for professionals, the SSC grossly mismanaged the Debtor prior to the Petition Date.

(i)      <u>Partner Draws and Expenses</u>

First, we shall confront the Committee's allegation that the Debtor improperly allowed partner draws and expenses to continue during the year 2005 "with knowledge of the firm's inevitable Dissolution." <u>See</u> Motion ¶ 42.  With the exception of a 2004 profit

distribution and a further discretionary bonus set aside of $1 million for 2004 profits made in March 2005, all profit distributions to partners were halted in March, 2005. <u>See</u> Kane Affidavit at ¶ 13. Moreover, as of March, 2005, cessation of partner draws was inappropriate because failing to pay continuing partner draws would unnecessarily accelerate partner withdrawals and office secessions, thereby further decreasing revenues during a period when the Debtor was seeking a merger partner or implementing a restructuring of its operations, and jeopardize value. <u>See</u> Kane Affidavit at ¶ 13. The Banks encouraged the continuation of partner draws from their collateral as they likewise perceived that cessation of this practice would all but halt the Debtor's merger and restructuring prospects.

The Section 1104 Motion also points to six (6) expenses of five (5) partners identified on the Debtor's statement of financial affairs totaling approximately $l20,000. As is made clear in the Kane Affidavit, four (4) of the identified expenses (with descriptions designed to excite) relate to Messrs. Scogin, Prieur and Stephens who are former partners of Coudert's China offices. As part of the deal with Orrick and prior to transfer of the Chinese licenses, Coudert's China offices continued to operate in the normal course of business. The expenses that the Committee references were both approved and refunded by Orrick, though initially paid from accounts in Coudert's name. The other two partner expenses referenced by the Committee in the Motion were made for discreet business justifications articulated in the Kane Affidavit that benefited the estate by facilitating the collection of over $1 million in receivables and preventing mass employee claims against the German offices. <u>See</u> Kane Affidavit at ¶ 46. Once again, these questions could have been answered with a simple meeting.

(ii)     The Baker Transaction

Second, the Committee points to the prior SSC's negotiation of the sale of certain assets related to Coudert's New York office to Baker & McKenzie LLP (the "Baker Transaction") as evidence of the current SSC's conflict of interest and mismanagement. As is evident from the Kane Affidavit, the Baker Transaction was negotiated in good faith and is the result of the best business judgment of management in place at that time.[7] See Kane Affidavit at ¶¶ 23, 25, 30. Nonetheless, the Debtor has repeatedly welcomed the review and scrutiny of the Committee, presumably acting in its statutory role as an independent and unbiased fiduciary, to determine if anything other than reasonably equivalent value was received by the Debtor's estate in the context of the Baker Transaction. Documents related to the Baker Transaction and each of the other sale transactions entered into by the Debtor during the Wind Down were provided within the first group of documents to McCarter. See Kane Affidavit at ¶ 62. Clearly, any further recovery to be achieved by way of the practice group transactions is a benefit to the Committee's constituency and this estate. As such, the Debtor appropriately suggested to McCarter that it would be willing to consider an STN waiver and allow the Committee to pursue any such causes of action on behalf of the Debtor's estate. In re STN Enterprises, 779 F. 2d 901 (2nd Cir. 1985). The Committee has not responded to this suggestion.

The Section 1104 Motion makes much of the New York lease being transferred to Baker for less than the market value alleged by the Committee to have existed. However,

---

[7] Information related to all practice group transactions was provided as Exhibit B to the Rule 1007 affidavit filed with this Court on the Petition Date, was provided to Committee counsel directly, and is attached as Exhibit H to the Kane Affidavit for the Court's ease of reference.

the analysis is not quite as simple as the Committee would have the parties in interest in this case believe.  See Kane Affidavit at ¶ 48.   Among other points omitted by the Committee, Coudert's landlord was an active and aggressive participant in the Baker Transaction as it related to real estate issues, since any assignment of the lease or sublease were subject to the landlord's consent, and the landlord was contractually entitled to one-half of any profit obtained from any lease assignment or sublease transaction.  Consequently, the landlord received $4 million out of the Baker Transaction, one-half of the amount paid by Baker for its rights to Coudert's former New York office space.

(iii)   <u>Capital Reserve Fund</u>

The third allegation leveled by the Committee at the former SSC concerning the prepetition Wind Down relates to the Debtor's perceived failure to create a sufficient capital reserve to fully fund the pension plan and professional fees.  As evidence of this alleged mismanagement, the Committee points to the Debtor's professional firms seeking and obtaining liens prior to bankruptcy.

First, let us suggest that it is a rare debtor that enters bankruptcy protection with fully funded reserves to pay all of its administrative expenses and prepetition priority claims.  It is clear that the Debtor, throughout the Wind Down beginning in August 2005, sought to minimize expense and maximize value.  See Kane Affidavit at ¶¶ 39, 40, 44, 47. In fact, one of the Banks was monitoring and limiting all use of cash to certain permitted expenditures on a weekly basis since December, 2005.  The Debtor simply would not have been permitted by the Banks to create the reserve suggested by the

Committee as the Banks had a perfected security interest in the Debtor's accounts receivable. See Kane Affidavit at ¶ 43.

At the outset of the Motion, the Committee alleges that during the "summer of 2005" as part of its "pre-bankruptcy financial engineering," "the firm pledged all of its assets to its Banks." See Motion at p. 2, ¶ 1. This intentionally misleading statement, which implies that the major firm assets were not already unencumbered by the Banks liens, is not clarified until much later in the Section 1104 Motion where the Committee acknowledges that the Banks had a lien on work-in-process, receivables and proceeds, the Debtor's most significant assets. See Motion at ¶ 7. By providing additional collateral to the Banks, the Debtor was not "callously disregarding its obligations." See Motion at p. 2, ¶ 1. To the contrary, the Banks were given additional security because the Debtor's Executive Board, prior to determining to Wind Down the Debtor, was very much engaged in attempting to "save the firm" through a transaction or through a restructuring of the firm. Additional security was provided as a result of the Banks' threats to accelerate the loans, which would have undoubtedly forced the firm into a chapter 11 filing, immediately destroying value. See Kane Affidavit at ¶ 29. Therefore, in the business judgment of the Executive Board, it was determined that creditors would benefit most from the firm continuing to operate in its normal course of business, rather than allowing the Banks to accelerate the loan and prematurely force the seemingly viable firm into a bankruptcy proceeding. See Kane Affidavit at ¶ 29.

Thereafter, the efforts of the SSC and the Debtor during the prepetition period resulted in a complete payoff of the Banks' secured claims and all of the fees incurred by the Banks' counsel as required under the loan agreements, which even the Committee

must recognize would have been required regardless of when the Debtor's estate were liquidated.

During the bulk of the Wind Down period, the SSC believed that an out-of-bankruptcy liquidation would maximize the value of the Debtor's assets, namely the collection of receivables and completion of the practice group sale, and minimize expenses.  <u>See</u> Kane Affidavit at ¶ 40.  If the creditors believed otherwise, nothing prevented them from organizing and filing an involuntary petition against the Debtor. They did not do so.

Lastly, and perhaps the most frustrating part of the prepetition Wind Down effort, involved the Debtor chasing the proverbial Chinese dragon.  In this case, the Debtor was trying to close the transaction (the "<u>China Transaction</u>"), transferring the majority of its China practice group to Orrick.  <u>See</u> Kane Affidavit at ¶ 50, and accompanying affidavit of Cameron Cowan, Esq. of Orrick.  The license transfer to Orrick, which was originally projected to take 30-60 days to get the approval of the Ministry of Justice of the People's Republic of China, instead took over one year.  Repeatedly, beginning in October, 2005 and continuing until September, 2006, the Debtor was advised by Orrick that if it could just hold on for another couple of weeks, the transfer of the Debtor's Chinese license to practice to Orrick would be approved by the Chinese Ministry of Justice and the China transaction would close.  The Debtor determined on many occasions to delay filing a chapter 11 petition so that it would not lose the roughly $4 million in transaction proceeds from Orrick.  It was made clear to the Debtor that the Chinese authorities would not approve the license transfer if the Debtor filed for bankruptcy, which would result in the China offices inability to operate under Chinese law and would have forced the

payment of significant severance to all employees and the closure of the China offices within 30 days.

b)  <u>Postpetition Period</u>

During the period following the Petition Date and with respect to current management of the Debtor (appointed on July 31, 2006), the Committee is only able to offer up what it perceives as an excessive annual overhead as evidence of a lack of competence deserving of a chapter 11 trustee.  The Section 1104 Motion completely ignores the fact that the Debtor, which started with a wind-down team of 60 people worldwide last year, has continually reduced headcount.  Indeed, on the Petition Date, the Debtor had 17 people on the wind-down team – and six of them left on September 30, 2006, one week after the filing, when their contracts expired.

The Committee has argued that the Debtor's failure to scale back expenses to the Committee's liking was evidence that "the Debtor was left with management insufficiently competent to conduct a business operation in furtherance of its fiduciary duty to creditors."  <u>See</u> Motion at ¶ 45.  Following its pattern of selective citations, the Committee cites <u>In re U.S. Communications of Westchester, Inc.</u>, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991), in support of this proposition, presumably to evidence a similar case on point to this argument.  However, this case does not even assert a holding remotely relevant to the case at bar.  In <u>U.S. Communications</u>, the Court appointed a trustee because "the debtor's failure to maintain a current general ledger and its failure to maintain its financial books and records to the extent that the accounting firm of Ernst and Young concluded that the debtor's financial records were unauditable."  <u>See</u> <u>Id</u>. at 495.  Just for example, this debtor's trial balance was out of balance by $12 million, the

general ledger had not been posted for five months, the debits did not equal the credits, the accounts receivable was off by $1.5 million, the debtor's controller did not even know what a $350,000 capital lease item represented, and the financial personnel had no idea about which entities owned a $600,000 deposit. Further, the debtor commingled funds which should have been held in a trust account for a secured creditor. Again, there is no relevance whatsoever to the case at bar, as no similar facts exist here.

It is helpful to the analysis for the Debtor to outline the postpetition relationship with the Committee and the context under which the Section 1104 Motion was brought. The Section 1104 Motion states on more than one occasion that "the Committee (first through counsel and later through its financial advisor) met with the Debtor and urged the Debtor to scale back expenses." See Motion at ¶ 45. This statement, without the appropriate context, is very misleading.

The Committee was formed on October 10, 2006 and first selected counsel on October 17, 2006. Introductions were made by counsel that evening and the information flow to the Committee from the Debtor literally started within hours and has continued through the date of this Opposition. The Debtor, though counsel, suggested an in-person meeting so that the SSC and the Committee members could confer about the Wind Down and the case strategy and projected recoveries. To the astonishment of Debtor's counsel, the suggestion was not accepted.

Instead, the first substantive communication from the Committee occurred through counsel at a meeting held on October 30, 2006 at McCarter's offices in New York, at which only attorneys for the Debtor, Committee and counsel for a single member of the Committee were present. This first meeting, had at the insistence of the

Debtor's counsel, was really more of a preliminary question and answer session designed to assist the Committee counsel with an understanding of the extensive documentation that was provided during the prior week and give an overview of the Wind Down and the Debtor's intentions in the chapter 11 process. At that meeting, general indications were provided by McCarter that the overhead was high in the Committee's view and it was suggested that the same be scaled back wherever possible. McCarter further suggested that the principal concern of the Committee was that Ms. Kane was a not trusted fiduciary in the view of the Committee and referenced undisclosed sources[8], including former partners of Coudert, who could purportedly corroborate some of the allegations now contained in the Section 1104 Motion. The Committee's message was communicated by counsel to the Debtor following that first meeting and the message naturally caused the Debtor's management great concern about the direction that the Committee might be headed in this case.[9]

After the first meeting, counsel to the Debtor and the Committee spoke and exchanged ideas concerning possibility of bridging the gap between the Committee's perception and the Debtor's reality. After deciding to forego the suggestion of a joint retention of financial advisors with the Debtor, McCarter advised on November 13, 2006 that the Committee had selected FTI Consulting, Inc. ("FTI") as its financial advisor.

[8] The Debtor's counsel requested these sources on at least two occasions, but has never been provided with any further information.

[9] Ms. Kane who has been made the focus of much of the Section 1104 Motion, was the primary witness for the Debtor with respect to the Debtor's financial condition in the punitive damages phase in the trial in May, 2005 in the Superior Court of the State of California, County of Los Angeles, California of an action entitled *Lyman Gardens Apartments, LLC et.al v. Coudert Brothers, LLP et al.,* index no. BC299990. The trial attorney for Lyman Gardens Apartments, LLC is co-chairing the Committee. The Debtor has sought to appeal the jury verdict entered against it in this matter.

The Debtor, through counsel, expressed concerns to FTI and McCarter about an apparent conflict of interest of FTI in that one of its principals is the expert witness for damages in <u>Gottlieb v. Hicks et. al</u>., a pending California malpractice action against the Debtor. The Debtor's counsel was assured by FTI that an appropriate "Chinese wall" could be established and maintained to minimize any harm that may be occasioned by and through the apparent conflict of interest. Hoping that the addition of a financial advisor might assist in realigning the perception of the Committee as to the Debtor and its view of the case, the Debtor acted in good faith and immediately began providing to the Committee, through FTI, extensive financial data, including several in person meetings. The Debtor did all this before seeing any retention papers and based upon the assurance that a protocol would be established to protect information. Regrettably, no details on the protocol to be established by FTI have been forthcoming from FTI, McCarter or the Committee since counsel's initial conversation with FTI.[10]

Contrary to the implication in the Section 1104 Motion, the truth is that the Debtor repeatedly welcomed the input from Committee related to what it viewed as an appropriate cost structure and retention plan for the Debtor's wind down team. In fact, the Debtor expected to receive a proposal from the Committee on more than one occasion. It was the Debtor's hope that with the addition of a competent financial advisor

---

[10] It should be clear that no conflict has been formally waived by the Debtor at this point in time and the Debtor is not aware of any application to retain FTI pending before this Court.

trusted by the Committee, the misperceptions of the Committee and could be corrected and some sensible proposals would be forthcoming.[11]

However, in the latter part of November, 2006, the Committee switched gears after several days of delay and, perhaps triangulating for what it considered an inevitable Section 1104 Motion, stated through counsel that it believed the Debtor had its own obligation to "right-size" the wind-down team and reduce administrative costs, refusing to offer even an indication of what it or its professionals believed the cost structure should be. Thereafter, following a demand and the threat of this Section 1104 Motion, the Debtor provided the Committee with its view of necessary overhead reductions by letter dated December 5, 2006. See Exhibit K to Kane Affidavit. The Committee did not offer any criticism or reasoned response, but rather filed the instant Section 1104 Motion apparently disappointed in the Debtor's planned overhead reductions.

Despite statements to the contrary in the Section 1104 Motion, the fact of the matter is that the Debtor's projected overhead for 2007 through the end of the Wind-Down team's contracts (September 30, 2007) amounts to $2 million. The SSC determined to reduce salaries as of January 1, 2007 (saving $21,000 on a monthly basis and $252,000 annually), make further cuts of wind down staff as of February 1, 2007, for additional savings of $18,375 monthly and $220,500 annually), and limit 401(k) matching by the Debtor to non-management (saving $8,400 on a monthly basis and $75,850 through the end of the Wind-Down.).

---

[11] FTI is familiar with the costs of administration to be incurred by a liquidating law firm given its intimate role as both chapter 7 trustee and accountants in the Brobeck Phleger & Harrison case still pending in the Northern District of California.

### 3. **"Current Management" Requirement**.

The Committee, in its Section 1104 Motion, appears to have intentionally blurred the line between the present membership of the SSC, the former SSC, and the Debtor's Executive Board, which managed the Debtor until September 2005. Indeed, the Section 1104 Motion incorrectly seeks to funnel through the statute's "cause" standard the alleged actions of the former members of the SSC, rather than its current members. Such arguments ignore the plain language of the statute, which limits any asserted actions constituting cause to those attributable to "current management". 11 U.S.C. § 1104(a)(1).

The Section 1104 Motion also unfairly focuses on one member of the current SSC in particular, Pat Kane, casting her as the "pre-petition engineer" of the Wind Down. This role ascribed by the Committee connotes a license of action for Ms. Kane that simply did not exist prior to July 31, 2006. She was an employee of the Debtor who reported to the Executive Board. As Executive Director, Ms. Kane was responsible for the administrative operations of the Debtor and was the person in charge of providing requested information and analyses to the Executive Board and for assisting the Executive Board in the implementation of its decisions. She attended all Executive Board meetings and generally acted as the interface between the Board and the firm's employees.

Excluding the arguments related to overhead during the postpetition period, the Section 1104 Motion points only to acts during Debtor's Wind Down, instead of addressing specific acts of *current* management. In other words, the basis of the Committee's argument is inconsistent with the plain language of the statute; conduct

prior to appointment of the current SSC is irrelevant and does not fit within the "current management" mandate of section 1104(a)(1) of the Bankruptcy Code.

The trustee battle fought in the <u>WorldCom</u> case just prior to the disclosure statement hearing, involved movants who initially relied on prepetition misconduct by former management to demonstrate the need for appointment of a trustee. <u>In re WorldCom, Inc.</u>, 2003 Bankr. LEXIS 2192 at *21 (Bankr. S.D.N.Y. 2003). Although at the hearing the movants focused on Debtor's postpetition conduct only, the court reiterated that under 1104(a)(1), the focus is on evaluating the conduct of current management. <u>Id</u>. There, the court observed that the movants merely disagreed with the Debtor's conclusions concerning how to best structure a plan (including the substantive consolidation of certain estates) which stemmed from Debtor's extensive investigation and analysis of the issues involved. <u>Id</u>. at 25. Consequently, the court found that "disagreement is not the basis for the appointment of a trustee where it appears the Debtors have appropriately discharged their fiduciary duty in evaluating and analyzing these issues and have reached an informed conclusion." <u>Id</u>. at 25-26. Much like the postpetition management in <u>Worldcom</u>, the SSC is attempting to discharge its fiduciary duties in this case and maximize value. The Committee's disagreement, without more, is inadequate.

Put simply, the Section 1104 Motion fails to allege any inappropriate conduct by current management, rather it merely states irrelevant arguments against former management or states the Committee's disagreement with the conclusions drawn by current management. The extraordinary remedy of appointing a chapter 11 trustee is not warranted on this basis.

**B.  Best Interests Test Cannot Be Established Under § 1104(a)(2)**

The Committee argues in the final portions of the Section 1104 Motion that because (1) "an independent fiduciary is best situated to investigate the circumstance that led to the Debtor's demise and to determine if the estate has claims against others that may be pursued for the benefit of creditors," and (2) "the business operations have been largely curtailed," a trustee should be appointed.  See Motion at ¶¶ 49, 50. [12]

Section 1104(a)(2), quoted earlier, authorizes appointment of a chapter 11 trustee upon an examination of the interests of the estate.  In re WorldCom, Inc., 2003 Bankr. LEXIS 2192 at *18.  However, under § 1104(a)(2), a creditor group, no matter how dominant, cannot justify the appointment of a trustee simply by alleging that it would be in its interests.  Id. at 19.  The WorldCom court relied on the important note that the "interests" standard requires that an appointment be in the interest of essentially all interested parties, and therefore the "interests" standard can only be satisfied where such appointment is in the interest of the estate.  Id.

**1.     Need For Independent Fiduciary**

With respect to the Committee's first asserted basis, the Committee appears confused.  Its role in the chapter 11 process often includes examination of the very things that its Motion suggests mandate an independent fiduciary.  The Committee refers to the potential for claims against "former management and others arising from misconduct" as justification, but fails to make the case.  The Committee's October 25, 2006 letter forwarding the complaint filed by the San Francisco Cannery (one of the Committee

---

[12] The Committee also cites case law to support an argument that a trustee must be appointed because of an erosion of confidence in the Debtor and its management; however, like much of the case law cited in the Motion, the cases are not on point.

members) against Ms. Kane and the former Coudert partners seeks the same relief as the Reconciliation Reimbursement Motion currently pending with this Court. Counsel for the Committee was advised that the substance of the matter was addressed in the motion and was provided a draft of this motion prior to its filing, but has refused to provide comments.

The Debtor has made much progress with respect to its bankruptcy proceeding as of the date of this Opposition and notwithstanding a dysfunctional relationship with the Committee. The Debtor is moving successfully towards a plan that can be confirmed. Indeed, a bar date of January 31, 2006 has been established, notices were mailed to over 1,000 parties last week, and will be published in the global edition of The Wall Street Journal on December 19, 2006. There are numerous other motions which have been filed with this Court and are scheduled to be presented to or heard by this Court shortly, including (1) partner reconciliation reimbursement motion, (2) motion to extend time to remove civil actions, (3) motion to extend exclusivity, (4) accounts receivable procedures motion, (5) de minimis sale procedures motion, (6) document retention and destruction program motion, and (7) other special counsel retentions. In addition, the Debtor has pursued an aggressive litigation program, commencing twenty-six (26) adversary proceedings to recover funds for the benefit of the estate and all creditors and the Debtor is preparing for commencement of at least twenty-five (25) more. Many of these matters will require persons with knowledge of the facts and business of the Debtor in order to properly evaluate the prospects for success and the appropriateness of any settlement offer – namely, the members of the SSC.

### 2. Remaining Tasks and Projects For Liquidation

With respect to the second basis asserted by the Committee for a trustee under section 1104(a)(2), the Debtor believes there is still much left to be done in these cases that requires the skill and knowledge that the well rounded SSC maintains. A list of remaining projects was provided to FTI, and is attached to the Kane Affidavit as Exhibit I. There appears to be no dispute as to the need for the work to be done; rather, the dispute appears to be who is going to do the work – the SSC, or a trustee.

### 3. Costs and Expense of Estate

Lastly, the appointment of a trustee would be very costly to the Debtor and its estate, with no actual or apparent benefit. The Committee appears so focused upon conspiracy theories and slinging mud in the Section 1104 Motion that it forgets its obligations to conduct the very cost benefit analysis that its request for relief requires.

Put simply, a trustee's effort to understand and learn about a global operation with the size and complexity of the Debtor would result in substantial delay and unnecessary expense for this estate. If outside professionals were to replace the Debtor's personnel at market hourly rates, the costs for amassing the historical knowledge base and completing the tasks would cost a multiple of the amounts forecasted and budgeted by the SSC.

The SSC is prepared to complete the liquidation of the Debtor with the meaningful participation of the Committee. The Debtor believes that the SSC is best suited to complete this process, with a well rounded group including the firm's top administrative manager with 15 years of experience and history with the firm, a former partner serving as the Debtor's General Counsel, and an independent restructuring

professional. The Debtor asserts that this structure is in the best interests of the estate and will result in the most efficient resolution.

## **CONCLUSION**

The sole justification identified in the Section 1104 Motion, and asserted repeatedly in differing formulations throughout, rests on the Committee's limited viewpoint and misperception about current management. Denial of the Section 1104 Motion is necessary here because the potential loss of the expertise and intimate knowledge of the current SSC would result in a strategically disadvantaged and depleted estate. For all the foregoing reasons, the Debtor respectfully requests that the Section 1104 Motion be denied in its entirety.

Dated: New York, New York
        December 18, 2006

KLESTADT & WINTERS, LLP
Attorneys for Coudert Brothers LLP
Debtor and Debtor in Possession

By: /s/ Tracy L. Klestadt_____
        Tracy L. Klestadt (TK-3591)
        John E. Jureller, Jr. (JJ-4697)
        Sean C. Southard (SS-2825)
292 Madison Avenue, 17th Floor
New York, New York 10017
Telephone No. (212) 972-3000